UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CAROLINE REICHERT,

                             Plaintiff,

                    v.

CASA SYSTEMS, INC., *et al.*,

                             Defendants.

No. 24-CV-996 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances:</u>

Anne L. Clark, Esq.
Vladeck, Raskin & Clark, P.C.
New York, NY
*Counsel for Plaintiff*

Ana C. Shields, Esq.
Jeffrey M. Schlossberg, Esq.
Michele Cattano, Esq.
Jackson Lewis P.C.
Melville, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Caroline Reichert ("Plaintiff"), a former employee of Casa, Inc. ("Casa"), brings this claim against Casa and its employees and officers Jerry Guo, Alfred deCardenas, Lucy Xie, and Jim Collier, (collectively, "Defendants"), alleging she was discriminated against because of her gender and retaliated against for raising her concerns about discrimination.  Defendants answered and moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) ("Motion"), arguing (1) Casa's Chapter 11 bankruptcy released her claims against Casa, deCardenas, and Collier, (2) Plaintiff failed to state a claim for violations of state law against

Guo and Xie, and (3) Plaintiff failed to state a claim against any defendant under the New York Labor Law.

For the reasons discussed below, the Court denies the Motion.

I.  Background

A.  Factual Background

The following facts are drawn from the Second Amended Complaint and assumed true for the purposes of this Motion.  *See Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021).

Plaintiff earned a bachelor's degree in electrical engineering and held advanced technical, sales, and managerial roles in the telecommunications industry for more than thirty years before being hired at Casa Systems ("Casa"), a "communications technology company" with about 500 employees in the United States and 900 worldwide.  (2d Am. Compl. ("SAC") ¶¶ 16–25 (Dkt. No. 24).)  Plaintiff joined Casa as a "Senior Account Director for Verizon . . . based largely on her prior direct experience, sales record, and extensive Verizon customer relationships."  (*Id.* ¶ 29.)  Jerry Guo ("Guo"), Casa's CEO, (*id.* ¶ 11), "conducted an extensive interview" in which he asked about Plaintiff's relationship with Verizon, (*id.* ¶ 30).  Plaintiff earned $150,000 annually "with a commission target of 100% of her salary" if she met sales quotas, a compensation package she negotiated with Lucy Xie ("Xie"), Casa's Senior Vice President of Operations, who "was responsible for all contract negotiations" with Casa employees.  (*Id.* ¶ 31.) Guo approved each contract.  (*Id.*).  Casa employees also earned quarterly commissions based in part on the percentage of their sales quotas they met; commission terms were set in a yearly Incentive Compensation Plan ("ICP") that could only be reconsidered by a committee consisting of three people, including Xie and Alfred de Cardenas ("deCardenas"), Casa's Chief Customer

Officer.  (*Id.* ¶¶ 51–56.)  Plaintiff was "one of two women on the 40-person sales team."  (*Id.* ¶ 33.)

Later that year, Casa hired Jim Collier ("Collier") as a Vice President of Sales, placing him as Plaintiff's direct supervisor.  (*Id.* ¶ 36.)  Plaintiff alleges Collier had "mentioned to another Casa employee on at least one occasion that he 'had trouble' working with women."  (*Id.* ¶ 37.)  While Collier was "getting up to speed" on the Verizon account, he "never asked Reichert to train him even though she had the strongest connections with Casa's contacts" there.  (*Id.* ¶ 38.)  In early 2019, Reggie Daniels ("Daniels"), with whom Plaintiff shared that account, "was promoted to Vice President of Sales and Business Development," making Collier Plaintiff's "second-line supervisor" and placing Daniels organizationally between her and Collier, although Daniels and Plaintiff continued to share responsibilities on the account.  (*Id.* ¶¶ 39–40.)  In the first quarter of 2021, Plaintiff and Xie discussed Plaintiff's experience working with Collier— Plaintiff explained to Xie that she did not feel comfortable discussing her experience, to which Xie responded, "in sum and substance, 'I now understand the situation.'"  (*Id.* ¶ 41.)

Through 2021, Plaintiff was "responsible for telecommunications solutions" at Casa, working on technical responses, proofs of concept, software deployments, and more, steering many millions of dollars to the firm.  (*Id.* ¶¶ 42–50.)  Plaintiff received commissions for the first two quarters of 2021 in line with her ICP and its quota for that year, $5 million, from which no products or projects were excluded.  (*Id.* ¶¶ 62, 65.)  Daniels left Casa in June, leaving Plaintiff alone on the Verizon account.  (*Id.* ¶¶ 66–67.)  Collier "repeatedly ignored" Plaintiff's requests to meet with him to discuss how Daniels' departure would affect the account.  (*Id.* ¶¶ 80–81.)  Plaintiff thrice "asked Collier if she could be considered for Daniels's position," but Collier

declined, telling Plaintiff on June 8, 2021, that "she was too junior, did not know enough people, and was not 'technical' enough," all of which Plaintiff alleges was false.  (*Id.* ¶ 68.)

Collier and Account Vice President David Ly thereafter excluded Plaintiff from meetings related to the Verizon account.  (*Id.* ¶¶ 69, 77–78.)  Ly, a man, was "an outside hire recruited by Collier" to replace Daniels, and Plaintiff alleges he was less qualified for the role than she was because, *inter alia*, he "did not have any existing relationships with individuals at Verizon."  (*Id.* ¶ 70.)  "Guo, Xie, and [de]Cardenas were all involved in the decision to hire Ly."  (*Id.*).  Jay Flake, another employee, was also brought onto the Verizon account as a Vice President.  (*Id.* ¶ 71.)  On two occasions, Plaintiff asked Collier why she was not considered for a Vice President position; Collier offered no explanation.  (*Id.* ¶¶ 71–72.)  Collier also told Plaintiff that Flake was hired "to work on previously negotiated maintenance contracts with Verizon," but had no reply to Plaintiff's response that there was only one such contract and it was valued at $50,000.  (*Id.* ¶ 73.)  Flake and Ly "were paid at least 20 to 25% more than [Plaintiff] was, despite their equivalent levels of experience."  (*Id.* ¶ 75.)  Flake was included in meetings relating to the Verizon account while Plaintiff was not, although he had not been hired to work on tasks relevant to those meetings.  (*Id.* ¶¶ 77–79.)  "Many of [Plaintiff's] male sales counterparts" and other male hires "received company equity while employed," but "[Plaintiff] did not."  (*Id.* ¶ 76.)

Plaintiff alleges she began to be subjected to a hostile work environment in June 2021 and complained about it within the firm.  On June 9, Plaintiff emailed deCardenas to follow up on an item from a recent call.  (*Id.* ¶¶ 82–83.)  Shortly after, "Collier called [her] and immediately took an aggressive tone, yelling at her and berating her for reaching out to [de]Cardenas directly," although Plaintiff had been told when she was hired that such communications were "encouraged."  (*Id.* ¶¶ 84–85.)  Plaintiff emailed Collier to register her

concerns with his behavior "and the environment that was being created," "ask[ing] him . . . to treat her with respect." (*Id.* ¶ 87.)  Collier responded that "this was not a topic to be discussed by email" but that "he would be happy to discuss it with her further." (*Id.* ¶ 91.)  Plaintiff "requested to meet with him with a third party present," but no meeting occurred. (*Id.* ¶ 92.)

Casa began demoting Plaintiff and docking her pay.  In October 2021, Plaintiff "was removed from all projects that she had identified as business for Casa," and Collier and Ly reduced her responsibilities from project ownership to "an administrative role only." (*Id.* ¶¶ 96–97.)  Plaintiff "asked why Casa had demoted her," but Collier "ignored her." (*Id.* ¶ 98).  The same day, Collier and Ly excluded Plaintiff from a meeting with a Verizon representative "despite the fact that [Plaintiff] was the only Casa employee who knew the account history." (*Id.* ¶ 100.)  In November 2021, Collier showed Plaintiff a "modified payout sheet" for the last two quarters of the year, "which retroactively reduced the commissions [Plaintiff] would receive and did not reflect the terms of the ICP that" she had previously signed, "retroactively increas[ing] her sales quota, remov[ing] multipliers, and add[ing] project and product exclusions." (*Id.* ¶¶ 104–08.)  Collier attributed the change to the "Sales Oversight Committee," and told Plaintiff she "was a 'smart woman' and 'should have known' that this would happen." (*Id.* ¶ 106.)  Plaintiff never signed or agreed to the new ICP. (*Id.* ¶¶ 115, 117.)  Casa deposited Plaintiff's third-quarter commission days later, in an amount Plaintiff communicated to Casa officers, including deCardenas, that she "did not accept." (*Id.* ¶¶ 116–18.)

Plaintiff more formally escalated her concerns.  She emailed Collier on November 16, 2021, stating Collier had "created a hostile and non-inclusive environment for her and that she was being treated less well because of her age and sex" considering changes to her role and compensation, and asking for a third party to be included on future work communications. (*Id.*

¶¶ 119–20.)  Plaintiff's attorney sent Guo a letter alleging Casa "had subjected [Plaintiff] to gender discrimination, breached her contract, and violated the NYLL." (*Id.* ¶ 121.)  Guo's demeanor towards Plaintiff "changed . . . to cold and standoffish." (*Id.* ¶ 122.)  Carmen Pombeiro, Casa's Vice President of Human Resources, contacted Plaintiff the next month "to discuss her complaints," and Plaintiff recounted largely the facts alleged above—Pombeiro told Plaintiff "Casa would investigate her claims," and the investigation ended a month later with "no evidence of discrimination or retaliation ha[ving] been found." (*Id.* ¶¶ 123–27.)

Plaintiff alleges her mistreatment continued.  In February 2022, Collier sent Plaintiff projected commissions for the prior quarter that Plaintiff objected to as inconsistent with her 2021 ICP, with numerous adjustments and exclusions she had not agreed to. (*Id.* ¶¶ 128–30.) She was nevertheless paid those downward-revised commissions. (*Id.* ¶ 132.)  Plaintiff raised the same objections again to Collier and Pombeiro. (*Id.* ¶ 133.)  Meanwhile, Collier and Ly "continued to exclude her from meetings and calls" on the Verizon account. (*Id.* ¶ 134.)  In March 2022, Plaintiff "received a list of her project assignments" for that year, most of which "were not likely to succeed or result in new contracts and revenue for Casa" or would not earn her commissions; in one such project, she alleges she was shut out of participating entirely. (*Id.* ¶¶ 141–45, 146.)   Plaintiff's 2022 ICP, which she received that April, had "essentially no opportunities for her to earn commissions in the first quarter of 2022," including on a million-dollar contract she secured with Verizon. (*Id.* ¶¶ 147–48.)  Plaintiff then filed a charge with the EEOC on April 14, 2022. (*Id.* ¶ 149.)  After she filed the charge, "she learned that Casa decreased the sales quotas for several of her male colleagues" while her quotas increased; did not pay her commissions on deals she had extensively worked on, because they were excluded from her new ICP; and "continued to exclude [her] from important meetings and discussions" on the

Verizon account.  (*Id.* ¶¶ 150–155.)  Plaintiff asked Casa about her missing commissions on August 25, 2022, including on $1 million in revenue she generated in the second quarter of 2022, and was told she would not receive them.  (*Id.* ¶¶ 155–57.)

A week later, "Collier informed [Plaintiff] that she was fired effective immediately," citing "company earnings" as the reason.  (*Id.* ¶¶ 158–59.)  At the time of her firing, Plaintiff alleges "she was the longest tenured female sales professional at Casa and on the highest-grossing account."  (*Id.* ¶ 160.)  A man with "no sales experience . . . took over Reichert's responsibilities."  (*Id.* ¶ 162.)  Plaintiff was offered no severance, although Casa did "offer[] severance to men in sales roles who were let go."  (*Id.* ¶ 167.)  Plaintiff did receive a "bonus based on exceeding performance goals in the quarter immediately before her firing."  (*Id.* ¶ 166.)

B.  Procedural History

Plaintiff initially filed her Complaint on February 9, 2024.  (*See* Compl. (Dkt. No. 1).)  She amended her Complaint on February 12, 2024, (*see* Am. Compl. (Dkt. No. 9)), which certain Defendants answered on April 8, 2024, (*see* Answer (Dkt. No. 15)).  The same day, Casa moved for a stay considering a Chapter 11 bankruptcy petition it had filed days earlier.  (*See* Letter Mot. to Stay (Dkt. No. 16).)  The Court granted the motion and expanded the stay to cover the non-Casa defendants.  (*See* Order Granting Letter Mot. to Stay (Dkt. No. 42).)  While the stay motion was pending, per a stipulation between the parties, Plaintiff filed her Second Amended Complaint on May 2, 2024, bringing claims for Title VII and state gender discrimination and retaliation, breach of contract, and unlawful wage deductions.  (*See* SAC.)  Certain Defendants answered on May 16, 2024, (*see* Answer to SAC (Dkt. No. 33)).  The United States Bankruptcy Court for the District of Delaware approved Casa's most recent bankruptcy plan in a confirmation order on June 5, 2024, with an effective date of June 7, 2024.  (*See* Letter Mot. Ex.

7

B (Dkt. No. 54).)  Once the stay was lifted, after several extensions and adjournments, Defendants filed the instant Motion for Judgment on the Pleadings on May 12, 2025, arguing Plaintiff's claims against Casa, deCardenas, and Collier were released in the bankruptcy, and Plaintiff's state-law claims against Guo and Xie should be dismissed.  (*See* Mem. of L. in Supp. of Mot. for J. on the Pleadings ("Defs.' Mem.") (Dkt. No. 70).)  Plaintiff responded on June 9, 2025.  (*See* Mem. of L. in Opp'n To Mot. for J. on the Pleadings ("Pl.'s Opp.") (Dkt. No. 75).)  Defendant replied on June 30, 2025.  (*See* Defs.' Reply Mem. of L. in Supp. of Mot. for J. on the Pleadings ("Reply") (Dkt. No. 77).)  Plaintiff sent the Court a letter with supplemental authority for her opposition on July 3, 2025, (*see* Letter from Pl. to Court (dated July 3, 2025) (Dkt. No. 78)), to which Defendants responded on July 7, 2025, (*see* Letter from Defs. to Court (dated July 7, 2025) (Dkt. No. 78)).

## II.  Discussion

### A.  Standard of Review

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)); *id.* at 302 ("Rule 12(c) has limited usefulness today in light of both Rule 12(b)(6) and Rule 12(d)[.]").  "[A] court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-movant" in a motion for judgment on the pleadings; "[t]his tenet, however, is inapplicable to legal conclusions." *Sarikaputar v. Veratip Corp.*, 371 F. Supp. 3d 101, 103 (S.D.N.Y. 2019) (internal citations and quotation marks omitted).  "To survive a motion for judgment on the pleadings, a pleading must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Pizza on 23rd Corp. v. Liberty Mut. Ins. Co.*, 723 F. Supp. 3d 307, 311 (S.D.N.Y. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted).

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007), and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss or for judgment on the pleadings, which follows the same standard, "a plaintiff's obligation to provide the grounds of [their] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration and internal quotation marks omitted).

9

B.   Analysis

1.  Release of claims in bankruptcy

Defendants lead their Motion with the argument that specific terms of Casa's bankruptcy released Plaintiff's claims against Casa, deCardenas, and Collier, and that accordingly, Defendants should both be granted leave to amend their answer to add the affirmative defense of waiver-and-release, and/or granted their motion for judgment on the pleadings (as to those three defendants) on the basis of that defense.  (*See* Defs.' Mem. 7.)  The Court grants Defendants leave to amend their Answer and considers the affirmative defense in resolving this motion.  But because the bankruptcy did not release Plaintiff's claims against Casa and perhaps may not have been able to release Plaintiff's claims against non-debtors, judgment on the pleadings as to these three defendants is inappropriate on this basis.

a.  Waiver for failure to include affirmative defense in answer

Plaintiff first argues Defendants waived this argument by failing to include it in their answer.  (Pl.'s Opp. 7.)  A party's answer "must affirmatively state any avoidance or affirmative defense, including . . . waiver," Fed. R. Civ. P. 8(c)(1), so ordinarily, "[a]n affirmative defense would . . . be waived by the defendant[s'] failing to assert the defense in [their] answer," *Walker v. Schult*, 45 F.4th 598, 615 (2d Cir. 2022); *see also* 5 A. Benjamin Spencer, Charles A. Wright, and Arthur C. Miller, Fed. Prac. & Proc. Civ. § 1278 (4th ed. 2025) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case."); *Syntek Cap., A.G. v. Welch*, No. 05-CV-180, 2006 WL 8452013, at *3 (N.D.N.Y. Feb. 16, 2006) ("[D]ischarge in bankruptcy is an affirmative defense which [may] be raised in an answer.").  But where the facts to establish an affirmative

10

defense first present themselves after the answer is filed, that rule is relaxed. *See Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 910 (2d Cir. 1998) ("[W]aiver may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party.").

Here, Defendants first answered the Second Amended Complaint on May 16, 2024, and their answer did not include the affirmative defense that any of Plaintiff's claims were released in Casa's bankruptcy. (*See* Answer to SAC ¶¶ 168–193.) But that defense did not become available to them until the event Defendants contend released Plaintiff's claims—the June 7, 2024 effective date of the June 5, 2024 order confirming Casa's bankruptcy plan, which included those releases. *See In re: Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 427, at 1 (Bankr. D. Del. June 7, 2024) ("The Effective Date of the Plan occurred on June 7, 2024."). With no intervening motions or pleadings following the answer, Defendants first raised this issue in a letter on July 12, 2024, a month after the confirmation order, and based their pre-motion letter for this Motion largely on this defense. (Letter from Defs. to Court (dated July 12, 2024) (Dkt. No. 44).) The defense is accordingly raised at the "first pragmatically possible time," in Defendants' first motion after their Answer, which could not have included it. *Am. Fed. Grp. Ltd.*, 136 F.3d at 910.

Plaintiff argues she was prejudiced because Defendants waited to add this defense until after she could no longer object to the bankruptcy plan. (Pl.'s Opp. 9.) The Court disagrees. First, Plaintiff "clearly had notice of the general release." *Gracia v. City of New York*, No. 16-CV-7329, 2017 WL 4286319, at *2 (S.D.N.Y. Sept. 26, 2017). Defendants contend that Plaintiff's claims were released as part of Casa's bankruptcy, the terms of which Plaintiff should have had notice as a member of the Official Committee of Unsecured Creditors; and the

Committee's counsel signed the Settlement Term Sheet, which referenced the Plan's releases. (*See* Defs.' Mem. 6–8; *In re: Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 315 (Bankr. D. Del. May 10, 2024), at 5 ("Settlement Term Sheet")).[1]  That Plaintiff may not have anticipated how Defendants would interpret the *effect* of the releases until after the deadline to object to or appeal the confirmation order is not prejudicial when Plaintiff knew or should have known the releases' terms.  *Cramer v. Hoffman*, 390 F.2d 19, 22 (2d Cir. 1968) (finding no prejudice from adding an affirmative defense where the addition "would hardly surprise plaintiffs"); *World Wide Commc'ns, Inc. v. Rozar*, No. 96-CV-1056, 1998 WL 249184, at *4 (S.D.N.Y. May 15, 1998) (finding no prejudice from adding an affirmative defense where plaintiff "was clearly on notice of that issue").  In any case, the Parties' communications to the Court indicate Plaintiff was aware of how Defendants may have intended to assert the releases they now rely on.  (*See* Defs.' Letter to Court (dated July 12, 2024) (explaining "Plaintiff indicated to Defendants on June 12, 2024 that she intended to file a motion with the Bankruptcy Court seeking permission to pursue

---

[1] The Court may take judicial notice of the Settlement Term Sheet for two reasons.  First, the Settlement Term Sheet's provisions were incorporated by reference into the Bankruptcy Court's Confirmation Order, so the Court may consider them not for any statement of fact but for their effect.  (*See In re: Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 421 (Bankr. D. Del. June 5, 2024), at 8 ("Confirmation Order") (describing the Settlement Term Sheet as a feature of "the Plan's implementation"); *id.* at 49 ("Notwithstanding anything in the foregoing, this Plan may not be amended, modified, or supplemented in a manner that is inconsistent with the Settlement Term Sheet.").  The Court accordingly looks to the Delaware bankruptcy docket for the relevant documents rather than to Defendants' exhibits.  Second, courts can take judicial notice of publicly filed settlement agreements from other cases, particularly where there are no disputes as to their authenticity.  *See, e.g.*, *Amazon.com Servs. LLC v. Digital Direct & More, Inc.*, No. 24-CV-07617, 2025 WL 1456501, at *4 n.7 (E.D.N.Y. May 21, 2025) ("[T]he Court may take judicial notice of, and therefore consider on a motion to dismiss, the Settlement Agreement and other documents filed in [a related] bankruptcy case and referenced by the parties." (citation omitted)); *Doe 1 v. Gov't of U.S. Virgin Islands*, 771 F. Supp. 3d 379, 388 (S.D.N.Y. 2025) (taking judicial notice, on a motion to dismiss, of a settlement agreement not mentioned or relied on in the complaint).

the claims asserted in this action against Casa, apparently notwithstanding the terms of the Bankruptcy Plan," which would have been within the deadline to appeal the confirmation order, but did not do so).  To consider the defense, therefore, "would not unfairly prejudice" Plaintiff. *Am. Fed. Grp. Ltd.*, 136 F.3d at 910.

Accordingly, the Court will proceed to the merits of Defendants' argument that the bankruptcy entitles them to judgment on the pleadings as to Casa, deCardenas, and Collier, and grants leave to amend to add the affirmative defense of waiver and release.[2]

### b.  Casa's bankruptcy and scope of Plaintiff's release

Casa and affiliated entities (together, "Casa") filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on April 3, 2024.  *In re Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 1 (Bankr. D. Del. Apr. 3, 2024).  The Office of the United States Trustee for the District of Delaware "appointed, pursuant to section 1102 of the Bankruptcy Code, an official committee of unsecured creditors ('the Committee')" on April 16, 2024.  *In re: Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 421 (Bankr. D. Del. June 5, 2024), at

---

[2] For now, because the defense is not part of the pleadings, the Court will consider it as an argument in the motion for judgment on the pleadings by taking judicial notice of the docket in Casa's proceedings in the United States Bankruptcy Court for the District of Delaware.  *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 293 n.4 (S.D.N.Y. 2002) ("tak[ing] judicial notice of [a party's] filing in [a] bankruptcy proceeding under Fed. R. Evid. 201").  Plaintiff's responsive briefing does not contest the accuracy of these papers.  The Court is also well-positioned to consider this argument at the motion for judgment on the pleadings stage.  *See, e.g.*, *Dantas v. Citibank, N.A.*, No. 17-CV-1257, 2018 WL 3023158, at *1, 4–10 (S.D.N.Y. June 18, 2018) (interpreting a settlement and release agreement in granting a motion to dismiss); *Waters v. Douglas*, No. 12-CV-1910, 2012 WL 5834919, at *4 (S.D.N.Y. Nov. 14, 2012) ("Because the [c]omplaint fails to state a claim in light of the previously executed release provisions, the defendant's motion is granted and the case is dismissed.").

8 ("Confirmation Order").[3]  Plaintiff, as an unsecured creditor, volunteered to serve on the Committee.  (Defs.' Mem. 2; Pl.'s Opp. 7.)  The Committee, Casa, and an ad hoc group of holders of certain claims filed a joint Settlement Term Sheet on May 10, 2024.  (*See* Settlement Term Sheet.)  The Bankruptcy Court entered a confirmation order on June 5, 2024, confirming the parties' Third Amended Joint Plan (the "Plan"), holding "the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan and the Settlement Term Sheet."  (Confirmation Order 18.)  The Confirmation Order went into effect on June 7, 2024.

The Settlement Term Sheet provides that "members of the Committee agree to be bound by the release provisions set forth in Article IX of the Plan as of the Effective Date."  (Settlement Term Sheet 8.)  Article IX.C provides that "all Holders of Claims, Interests, or Causes of Action that elect to opt into the releases contained in this Article IX.C, and all other Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released each Debtor and Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever."  *In re: Casa Sys., et al.*, No. 24-BK-10695, Dkt. No. 399 Ex. A, at 53 (Bankr. D. Del. June 3, 2024) ("Plan").  The Plan defines Releasing Parties as "each of the following and in each case in its capacity as such: (a) all Holders of all Claims, Interests, or Causes of Action that elect to opt into the releases contained in Article IX.C of this Plan; . . . (c) the Committee and its members, each in their capacities as such."  (Plan 19.)  And finally, the Confirmation Order found that "[t]he release of Claims and

---

[3] All page number citations to any document or filing on the bankruptcy docket are to the page number of the document itself, and not the number that may be stamped on any page.  Page number citations to memoranda are to the numbers on the bottom of each page.

Causes of Action by the Releasing Parties, as described in Article IX.C of the Plan," including as to non-debtors, "was consensually provided . . .[,] was negotiated as a result of extensive arms'-length and good faith negotiations among the Debtors, the Ad Hoc Group, and the Committee . . . and provides finality for the Debtors . . . and the other Released Parties," and accordingly approved these release provisions. (Confirmation Order 19–20.)

Defendants contend the Settlement Term Sheet entirely released Plaintiff's claims against Casa, deCardenas, and Collier, and limited any recovery for Plaintiff's claims against Guo and Xie to the proceeds of Casa's directors-and-officers liability insurance policies ("D&O Insurance"). (*See* Defs.' Mem. 7.) Defendants insist the Court overlook the Plan in reaching this conclusion. (Reply 2 ("This Court need not rely on the Plan.").) But the Settlement Term Sheet's release provisions are not so blunt and *must* be read in the context of the Plan, which the Settlement Term Sheet expressly references. The Settlement Term Sheet provides that "the members of the Committee agree to be bound by the release provisions *set forth in Article IX of the Plan*." (Settlement Term Sheet 8.) Plaintiff responds that Article IX.C of the Plan releases two groups' claims, as relevant here—holders of claims *that opted into the releases*, which she contends she did not, (*see* Pl.'s Opp. 11 ("Defendants do not argue that Plaintiff ever opted into the releases contained in the Plan, because she did not.")), and all other Releasing Parties. That latter group is defined *only* in the Plan and includes the Committee's members only "in their capacities as such." (Plan 19.)[4] And that clause "has meaning," Plaintiff contends: claims she

---

[4] Defendants argue the "in their capacities as such" phrase from the Plan should be ignored because the Confirmation Order "does not contain it." (Reply 2.) This argument runs headfirst into the clear text of Confirmation Order, which refers to "Releasing Parties, *as described in Article IX.C of the Plan*," and accordingly requires reference to the Plan to define. (Confirmation Order 19.) And, of course, the Plan's definition of "Releasing Parties" refers twice to Committee members "in their capacities as such." (Plan 19.)

releases *in her capacity as a Committee member* are different from claims she releases *in her capacity as a creditor*.  (Pl.'s Opp. 11.)

The Court agrees Plaintiff's claims against Casa were only released "in her capacity as" a member of the Committee and agrees that carries a distinct meaning.  The Settlement Term Sheet and the Confirmation Order both unambiguously refer back to the Plan's release provisions, which reference "Releasing Parties," a term only defined in the Plan.  (Settlement Term Sheet 8 ("[T]he members of the Committee agree to be bound by the release provisions set forth in Article IX of the Plan[.]"); Confirmation Order 19–20, 37 (likewise referencing Article IX); Plan 53 (referencing, in Article IX, "Releasing Parties," which the plan defines earlier as described above).)  And the only bucket in the Plan's definition into which Plaintiff could fall—assuming, as the Parties do, that she did not personally opt in to any releases—is as a member of the Committee.  (Plan 19 (defining "Releasing Party").)  That the Plan's definition uses "in their capacities as such" twice—both at the top of the list of Releasing Parties and when mentioning members of the Committee—makes it clear that its inclusion is no accident.  (*Id.* at 19.)  There are claims creditors' committees can bring that individual members could not, that can make sense to release in settling bankruptcy disputes and confirming a plan.  For example, "a creditors' committee may sue on behalf of the debtors" to grow the estate, "with the approval and supervision of a bankruptcy court, not only where the debtor in possession unreasonably fails to bring suit on its claims, but also where the trustee or debtor in possession consents." *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001).  And, as Plaintiff notes, creditors' committees can seek recovery from the debtor, for example, to recoup their expenses in seeking to maximize the value of the estate.  *See* 11 U.S.C. § 503(b); *see also In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 289–290 (S.D.N.Y. 2014) (explaining certain expenses committees

16

may seek, some of which are given priority in asset distribution).  Furthermore, this language is common in bankruptcy plans.  *See, e.g.*, *In re Stearns Holdings, LLC*, No. 19-12226 (Bankr. S.D.N.Y. Nov. 13, 2019), Dkt. No. 459, at 10 (including as "Releasing Parties" the creditors' committee and its members "in their capacity as such"); *In re: Serta Simmons Bedding, LLC*, No. 23-90020 (Bankr. S.D. Tex. May 23, 2023), Dkt. No. 978, at 25 (same); *In re Dietech Holding Corp.*, 606 B.R. 544, 627–28 (Bankr. S.D.N.Y. 2019) (same).  The Court is skeptical that in each of these plans, the creditors agreed to forfeit any of the debts they were owed and any *pro rata* share of the estate they were personally entitled to, simply for the pleasure of serving on a creditors' committee.  Accordingly, unless another provision in the Confirmation Order released Plaintiff's claims, her claim against Casa may continue.[5]

Denying judgment on the pleadings as to deCardenas and Collier would be proper for an independent reason—the Bankruptcy Code does not allow such a release.  The Supreme Court recently held that a bankruptcy plan may not release claims against non-debtors "without the consent of affected claimants."  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024).[6]

---

[5] Unless discharged or released, pre-petition claims against the debtor can continue.  *See In re Guido*, No. 19-02571, 2021 WL 2226613, at *4 (Bankr. S.D. Cal. June 1, 2021) ("Pre-petition litigation remains valid and not stay violative after a bankruptcy case commences. Indeed, in some cases, a bankruptcy court will lift the stay to allow resolution of issues in the pre-petition forum.  In other cases, the debtor may not obtain any discharge or may not obtain a discharge of a debt at issue in the pre-petition litigation; litigation could then continue after the bankruptcy case concludes.").  Defendants have not argued any general discharge injunction was issued in the bankruptcy proceedings, and "where the reorganization plan does not discharge a prepetition claim, the prepetition claim survives confirmation."  *In re Gordon Sel-Way, Inc.*, 239 B.R. 741, 751 (E.D. Mich. 1999).  So, while some other provision of the Plan, Settlement Term Sheet, or Confirmation Order may have released Plaintiff's pre-petition claim—as often occurs in Chapter 11 bankruptcies—the Court concludes the only release provisions Defendants point to did not.

[6] *Purdue* did not hold that claims against the *debtor* could not be released without the consent of all affected claimants.  *See Purdue Pharma*, 603 U.S. at 218 ("When Congress authorized 'appropriate' plan provisions in [11 U.S.C. § 1123(b)(6)], it did so only after

Defendants' Reply does not contest Plaintiff's argument that if *Purdue* governed, these third-party releases would be invalid—as explained above, Plaintiff and Defendants seem to agree, at least at this early stage, that Plaintiff did not opt into them.  (Pl.'s Opp. 11 ("Defendants do not argue that Plaintiff ever opted into the releases contained in the Plan, because she did not.").)  *See Purdue Pharma*, 603 U.S. at 223.  Defendants argue only that *Purdue* "was decided *after* the Confirmation Order's effective date" in Casa's bankruptcy, but that does not make *Purdue* "therefore inapplicable."  (Reply 3 n.3.)  *Purdue*, decided less than three weeks after Casa's bankruptcy plan was confirmed, expressly refused to "address whether its reading of the bankruptcy code would justify unwinding reorganization plans that have *already become effective and have been substantially consummated*."  603 U.S. at 206 (emphasis added); *see In re: Boy Scouts of Am.*, 137 F.4th 126, 167, 170 (3d Cir. 2025) (invalidating certain non-debtor releases in a bankruptcy plan that became effective a year before *Purdue Pharma*, and allowing others where claims concerning them were statutorily moot under 11 U.S.C. § 363(m)), *cert. denied sub nom Lujan Claimants v. Boy Scouts of Am.*, --- S. Ct. ---, 2026 WL 79599 (Jan. 12, 2026).  So *Purdue* may or may not apply here, depending on whether allowing Plaintiff's employment discrimination claims would "unwind" the Plan (assuming she did release the claims, which the Court is not persuaded she did)—something that cannot be resolved at this stage on this record.[7]  Accordingly, while the Court cannot hold at this stage that *Purdue*

---

enumerating five specific sorts of provisions, all of which concern the *debtor* . . . . But the catchall cannot be fairly read to endow a bankruptcy court with the radically different power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." (citation and quotation marks omitted) (emphasis in original)).  Therefore, Plaintiff's consent is only an issue for the releases of claims against nondebtors.

[7] While the Confirmation Order provides that "[o]n the Effective Date, the Plan shall be deemed to be substantially consummated under [S]ections 1101 and 1127 of the Bankruptcy Code," (Confirmation Order 53), whether a reorganization plan has been substantially

forecloses the non-debtor releases that Defendants describe as "integral" to the settlement, (Reply 3), it cannot agree *Purdue* is inapplicable, either.  But even if *Purdue* did not apply, under pre-*Purdue* caselaw, Defendants would have to show Plaintiff earned some sort of consideration for deCardenas and Collier's releases, and thus far, they have not.  *See In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (invalidating certain non-debtor releases where "[p]laintiffs, who have never had their day in court, have been forced to forfeit their claims against non-debtors with no consideration in return").  Accordingly, the Court denies the Motion to the extent it seeks to dismiss the claims against Collier and deCardenas at this stage.

Finally, Defendants argue Plaintiff's claims against Guo and Xie are limited to the proceeds of Casa's D&O insurance, which they contend would not cover these claims.  (Defs.' Mem. 15–16.)  Their argument is premised on Paragraph 88 of the Confirmation Order, which provides in relevant part that "the members of the Committee agree to be bound by the release provisions set forth in Article IX of the Plan . . . *provided* that the foregoing shall not apply to the pursuit of claims against the Non-Released parties; *provided, further*, that recoveries on account of Preserved D&O Actions shall be limited to the proceeds of the D&O Liability Insurance Policies."  (Confirmation Order 37.)  "Non-Released Parties" is defined in the Plan to include Guo and Xie, (Plan 16), and "Preserved D&O Actions" is defined as "any Claims against the Non-Released Parties, other than" certain claims relating to their pre-petition severance payouts, (*id.*).  And the "in their capacities as such" language that is determinative above does not seem to govern here, because the Confirmation Order stipulates that "the foregoing"—*i.e.*, Article IX's

---

consummated is a "matter of fact" and the Bankruptcy Court here did not lay out its basis for that factual determination, *In re Box Bros. Holding Co.*, 194 B.R. 32, 45 (D. Del. 1996); *see also In re Antiquities of Nevada*, 173 B.R. 926, 928 (B.A.P. 9th Cir. 1994) ("Whether a plan has been 'substantially consummated' is a question of fact to be determined upon the circumstances of each case." (citation omitted)).

release provisions, which include the "Releasing Parties" term the Plan defines with "in their capacities as such"—"shall not apply to the pursuit of claims against" Guo and Xie. (Confirmation Order 37.)  On its face, this would cover this Action as against Guo and Xie, since this is a non-severance-related claim against them.  But this restriction would be, in effect, a discharge of a claim against non-debtors—Defendants are contending Casa's bankruptcy would nullify any recovery on Plaintiff's claims against Guo and Xie—and *Purdue* rejected formalist distinctions that would allow a non-debtor discharge by another name.  *Purdue Pharma*, 603 U.S. at 223 ("Whatever limits the code imposes on debtors and discharges mean nothing, [plan proponents] say, because the [non-debtors] seek a 'release,' not a 'discharge.'  But word games cannot obscure the underlying reality. . . . Describe the relief the [non-debtors] seek how you will, nothing in the bankruptcy code contemplates (much less authorizes) it.").  Critically, Plaintiff contends she did not consent to these provisions—if she *had*, *see Purdue Pharma*, 603 U.S. at 226, they would be permissible.  (Pl.'s Opp. 16 ("[P]ermitting such compromise of claims would be in contravention of the Supreme Court's *Purdue Pharma* decision, which specifies that a bankruptcy plan cannot affect the liabilities of third parties absent the creditors' consent.").)  And as above, Defendants offer no argument that *Purdue* is inapplicable because the bankruptcy has already been substantially consummated or allowing this claim would unwind the Plan.  Accordingly, because Defendants do not point the Court to anything of which the Court may take judicial notice at this stage indicating Plaintiff *did* consent to these provisions or that *Purdue* is inapplicable, the Court denies Defendants' Motion insofar as it seeks to dismiss the Guo and Xie claims on this basis.

20

### 2.  New York Human Rights Law claims

Plaintiff argues Defendants violated the New York State Human Rights Law ("NYSHRL") both by aiding and abetting unlawful discrimination and by retaliating against Plaintiff for voicing her concerns about her discrimination.  (*See* Compl. ¶¶ 172–75, 180–83; Pl.'s Opp. 17–20.)  Defendants only contest this count with respect to Guo and Xie.  (Defs.' Mem. 9–11.)

Defendants first respond that Guo and Xie are not "employers" who may be held liable as individuals under the NYSHRL for discrimination and retaliation at all.  (Defs.' Mem. 8–9.) Some of the NYSHRL's antidiscrimination provisions apply to "an employer," *e.g.*, N.Y. Exec. L. § 296(1)(a), and because "Guo and Xie did not employ Plaintiff; Casa did," Defendants contend only Casa may be held liable under those provisions, (Defs.' Mem. 8).  *See Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 459 (N.Y. 2021) ("[T]he State HRL does not render employees liable as individual employers." (citing *Patrowich v. Chem. Bank*, 473 N.E.2d 11 (N.Y. 1984)).[8]  However, the aiding-and-abetting and retaliation claims that Plaintiff asserts against Guo and Xie rely on sections of the NYSHRL that do *not* contain language limiting liability to employers.  N.Y. Exec. L. § 296(6) ("It shall be an unlawful discriminatory practice for *any person* to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article[.]" (emphasis added)); *id.* § 296(7) ("It shall be an unlawful discriminatory practice for *any person* engaged in any activity to which this section applies to retaliate or discriminate against any person . . ." (emphasis added)).  And the *Doe* Court explained that it did not hold individuals could *never* be held directly liable under the NYSHRL—rather, it held that

---

[8] That "Guo and Xie possessed the power to hire or fire" does not make them employers as a matter of the NYSHRL.  (Pl.'s Opp. 17.)  The majority opinion in *Doe* rejected exactly that argument.  *See Doe*, 167 N.E.3d at 459–60.

individuals are not "employers" in the meaning of the statute, and so cannot be held liable under § 296(1). *Doe*, 167 N.E.3d at 460 ("differentiating between the liable party (employer) and the party committing the offending conduct (employee or agent with managerial or supervisory responsibility)" in the context of the NYCHRL, which "language [is] like that found in the State HRL"). That court was also clear that it was not assessing any claims against the individual defendant under § 296(6). *Id.* at 463 ("Any claims that [the defendant] engaged in offending conduct against plaintiff by discriminating, aiding and abetting discrimination, or retaliating are not advanced in this appeal.").

Accordingly, Plaintiff need not establish that Guo and Xie are employers to prevail on her claims, nor could she after *Doe*, so long as Plaintiff shows they could be liable as individuals under another provision of § 296 than § 296(1). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quotation marks omitted) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), *as recognized in Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 523 n.83 (2d Cir. 2023); *see also Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024) (individuals may be held liable on a claim advanced under a Section 296(6) theory); *Santana v. Yonkers City Sch. Dist.*, 205 N.Y.S.3d 691, 699 (Sup. Ct. 2023) (granting summary judgment as to claim brought under § 296(1) against employee of school but denying summary judgment as to claims against the same defendant on aiding and abetting theories); *Felton v. Monroe Cmty. Coll.*, 579 F. Supp. 3d 400, 410 (W.D.N.Y. 2022) (same, and explaining that individual defendant may be liable for aiding and abetting if he actually participates in conduct giving rise

to claim); *Mahoney v. City of Albany*, 181 N.Y.S.3d 716, 725 (App. Div. 2022) (explaining aiding and abetting liability requires proof of active participation in the allegedly-discriminatory conduct); *Patrick v. Garlick*, 66 F. Supp. 3d 325, 332 (W.D.N.Y. 2014) (denying motion to dismiss NYSHRL claims against supervisor because plaintiff adequately alleged that the supervisor actively aided and abetted in discrimination and retaliation, and collecting cases).  In addition to actually participating in the conduct, the defendant must also "share[] the intent or purpose of the principal actor."  *McSweeney*, 776 F. Supp. 3d at 259–60 (alterations adopted, quotation marks and citations omitted).

Defendants next argue Guo and Xie's conduct, as alleged, did not violate the statute, because Guo and Xie did not "independently participate in the conduct giving rise to the complaint," and Plaintiff "does not allege a single allegation of discrimination or 'less well' treatment by either Guo or Xie." (Defs.' Mem. 10.)   The Court disagrees.  Plaintiff alleges several instances of "'less well' treatment," (*id.*), and individual participation in Plaintiff's discrimination, by Guo and Xie that would be actionable under § 296(6).  She claims Xie personally negotiated all contracts with Casa employees and Guo personally approved them, (SAC ¶ 31), both were personally involved in the decision to hire a less qualified male employee for a more senior position, (*id.* ¶ 70), and Xie (with whom Plaintiff had previously discussed her concerns) was on the committee that approved ICP reconsiderations (*id.* ¶ 56).  That states a claim under the NYSHRL that Guo and Xie, to whom Plaintiff had often "complained" about the relevant events, (*id.* ¶ 2), at least aided and abetted Collier's discrimination (if not one another's) insofar as Collier was a plausible impetus for those decisions, (*see, e.g., id.* ¶¶ 128–30, 158–59).

And Defendants have not argued the facts alleged do not make out a claim against Collier.[9] *See Hirsch v. Columbia Univ., Coll. of Physicians & Surgeons*, 293 F. Supp. 2d 372, 378 (S.D.N.Y. 2003) (dismissing an NYSHRL claim where "there [wa]s nothing [in the complaint] to indicate that [defendant] personally determined the salary for [plaintiff] or the allegedly comparable male counterpart").  Plaintiff also alleges Guo and Xie, although she "complained to [them] about Collier's discriminatory conduct . . . failed to intervene" even though they were in a position to remedy the discrimination and aware of it, beyond an investigation the Complaint alleges was cursory.  (Pl.'s Opp. 18–19; SAC ¶ 127.)  That, too, suffices at this early stage in the context of these allegations.  *See Moazzaz v. MetLife, Inc.*, No. 19-CV-10531, 2021 WL 827648, at *15 (S.D.N.Y. Mar. 4, 2021) ("And at the pleading stage, an individual defendant's failure to investigate a complaint of unlawful discrimination, even if not actionable 'in and of itself,' gives rise to the inference that the defendant 'encouraged, condoned, or approved' the offending conduct, aiding and abetting it." (quoting *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999), and *Hicks v. IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999))); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) ("To state a claim for aiding and abetting [in violation of § 296(6)] . . . a plaintiff must instead plead that the defendant actually participated in such unlawful conduct by the employer. . . . A supervisor's failure to take adequate remedial measures in response to a complaint of

---

[9] It is also possible, though unsettled and not clearly resolved by the text of the NYSHRL, that these Defendants could aid and abet Casa's direct liability.  *See Trapani v. Freeport Pub. Sch. Dist.*, No. 24-CV-3005, 2025 WL 2306658, at *6 (E.D.N.Y. May 2, 2025) ("It is unclear from *Tomka*'s holding, however, whether the Second Circuit concluded that the co-workers were liable because they aided and abetted each other's conduct, or because their conduct imposed liability on their employer, which liability the co-workers aided and abetted." (discussing *Tomka*, 66 F.3d at 1317)), *report and recommendation adopted*, 2025 WL 1812324 (E.D.N.Y. July 2, 2025).

discrimination can, with proper factual allegations, constitute actual participation." (internal quotation marks and citations omitted, alteration adopted)).

Finally, Defendants argue Plaintiff failed to allege Guo and Xie had a discriminatory intent or shared Collier's discriminatory intent. (*See* Defs.' Mem. 9–10.) But Defendants only argue this to the extent Guo and Xie's actions themselves were too minimal to establish liability in the first place. (*See* Defs.' Mem. 9–10 (arguing the SAC does not allege Guo and Xie met the intent element because of the "miniscule role" they played). Because the Court finds their actions as alleged do rise at least to aiding and abetting discriminatory conduct, the Court rejects this argument. Accordingly, Plaintiff has plausibly alleged Guo and Xie's liability under § 296(6).[10]

Defendants' argument that Plaintiff's allegations do not state a retaliation claim against Guo and Xie is also unpersuasive. "To make out a prima facie case of retaliation" under the NYSHRL, "a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (citation and quotation marks omitted); *see also* N.Y. Exec. L. § 296(7).

---

[10] Defendants also argue the Court should reject any aiding-and-abetting claims asserted against Guo and Xie because they are not in the Complaint, which did not give adequate notice to Guo and Xie of those claims. (Reply 4.) The Court disagrees—the Complaint's factual allegations as to Guo and Xie's involvement, as recounted above, provide them clear notice of the events Plaintiff's claim is about, and the NYSHRL counts against them are pled under § 296, of which § 296(6) is a subpart. (*See* SAC ¶¶ 3, 172–75.) To dismiss this count against Guo and Xie on this basis would be to "resort to an arid ritual of meaningless form." *Staub v. City of Baxley*, 355 U.S. 313, 320 (1958).

25

Plaintiff contends first, that she engaged in protected activity of which her employer was aware by, *inter alia*, "complain[ing] repeatedly, including directly to Guo and Xie, regarding Defendants' failure to pay her full wages owed to her," (Pl.'s Opp. 24; SAC ¶ 2), sending a letter through counsel to Guo "stating that the company subjected [Plaintiff] to gender discrimination," (SAC ¶ 121), and filing an EEOC charge also "alleging gender discrimination and retaliation," (*id.* ¶ 149). *See Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) ("Protected activity within the meaning of the NYSHRL . . . is conduct that 'oppos[es] or complain[s] about unlawful discrimination.'" (quoting *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1012 (N.Y. 2004))).

She also alleges adverse employment actions were taken against her—she was denied a promotion, (SAC ¶¶ 66–72), her commissions were withheld, (*id.* ¶¶ 128–133), and Casa fired her without severance, (*id.* ¶ 158)—and that Guo and Xie played personal roles in decisions relating to contracts with employees, hiring, and commissions, (*id.* ¶¶ 31, 56, 70). These plausibly constitute adverse employment actions under the state or federal standards, and Defendants' briefing does not meaningfully contest that they are, (*see* Defs.' Mem.). *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) (holding the text of Title VII requires a plaintiff to show not "that the harm incurred was significant[] [o]r serious, or substantial," but only that there was "some harm respecting an identifiable term or condition of employment" leaving the plaintiff "worse off"); *Anderson v. Amazon.com, Inc.*, No. 23-CV-8347, 2024 WL 2801986, at *11 (S.D.N.Y. May 31, 2024) (explaining that the "NYSHRL standard is . . . similar to that articulated in *Muldrow*, so the same conclusion follows"); *Darwin v. Newburgh Ops., LLC*, No. 22-CV-0872, 2025 WL 104140, at *9 (S.D.N.Y. Jan. 15, 2025) (same). Defendants' argument that these actions were not adverse because "[i]n fact, Plaintiff was not dissuaded at

26

all" by them is unpersuasive. (Defs.' Mem. 11.) That view does not derive from the text of the NYSHRL, (*see* N.Y. Exec. L. § 296(7)), finds no support in the caselaw, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *3 (S.D.N.Y. Dec. 15, 2022) ("[A]ctual 'dissuasion' from the protected activity is not required to make out a *prima facie* case of retaliation."), and is logically untenable because a retaliation claim would then require both that an employee engage in protected activity, and that the employee be dissuaded from doing so.

Finally, the facts alleged allow the plausible inference that the adverse actions were taken because of her protected activity—the actions followed her complaints, *see Lewis v. City of Buffalo Police Dep't*, No. 02-CV-0735, 2007 WL 4191810, at *9 (W.D.N.Y. Nov. 21, 2007) ("A causal link between adverse action and retaliatory motive may be proven indirectly by showing that protected activity was closely followed with discriminatory action." (citing *Gilford v. City of New York*, No. 03-CV-91, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004), *aff'd*, 136 F. Appx. 390 (2d Cir. 2005) (summary order)), *aff'd*, 311 F. App'x 416 (2d Cir. 2009) (summary order), and Plaintiff alleges the justifications she was offered for those actions had no basis in fact, *see Goldzweig v. Consol. Edison Co. of N.Y., Inc.*, 25-0089-CV, 2026 WL 21005, at *3 (2d Cir. Jan. 5, 2026) (summary order) (affirming summary judgment against plaintiff on an NYSHRL retaliation claim where defendant "adduced sufficient evidence of a legitimate non-discriminatory reason for terminating" the plaintiff); *Johnson v. Reliable Mail Serv., Inc.*, No. 99-CV-5877, 2001 WL 1506007, at *4 (denying summary judgment on NYSHRL claim where "defendant has failed to come forward with a legitimate, nondiscriminatory reason for plaintiff's alleged termination"). There is accordingly enough at this early stage to state a NYSHRL retaliation claim against Guo and Xie.

3.  New York Labor Law claims

Plaintiff alleges all Defendants violated the New York Labor Law ("NYLL") in three ways—first, that she was not paid her earned commissions; second, that she was not paid the same as men at Casa doing comparable work; and third, that she was retaliated against for expressing her opposition to the above.  (SAC ¶¶ 184–85, 189–93).  Besides their arguments specific to Guo and Xie, which the Court has addressed above, Defendants offer three responses.

First, Defendants argue Plaintiff has not adequately alleged that a comparable male employee was paid more than she was.  (Defs.' Mem. 11–12 ("Plaintiff offers no facts to support the conclusory assertion that these male Vice Presidents were paid more than her or that they are even appropriate comparators.  Further, Plaintiff's allegation that she and her alleged comparators have equal level[s] of experience is entirely conclusory.").)  But the Complaint plausibly does so.  To state a claim under the NYLL's Equal Pay Act, Plaintiff need only point to one comparable male employee who was paid more than she was.  *Eisenhauer v. Culinary Inst. of Am.*, 242 N.Y.S.3d 449, 471 (Sup. Ct. 2025) ("Plain language, remedial purpose, amendatory evolution and decisional context each impels this Court to find that a protected-class plaintiff can state a Labor Law § 194(1) pay-gap claim based on her or his own salary relative to a sole comparator outside the protected class.").[11]  She alleges that she has over three decades of technical, sales, and managerial experience, and a technical degree, and was hired for her role in

---

[11] While the Court agrees with Defendants this is but one state trial court's decision, that decision carries meaningful weight on questions of state law, where the Court's task is to predict how New York State's highest court will rule, not to substitute its own judgment.  *Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan*, 263 F.3d 196, 203 (2d Cir. 2001) ("[I]t is well-established that the controlling interpretation of state laws should normally be given by state rather than federal courts.").  Because this was the first state court decision to confront this question and the Court sees no error in its reasoning, the Court will adopt the New York Supreme Court's view on this question.

28

meaningful part because of her contacts with one Casa client.  (SAC ¶¶ 15–24.)  She further alleges that two male employees were paid "20 to 25%" more and that she was passed over in their favor for higher roles, even though their experience was equivalent or *lesser* considering they lacked the contacts she had.  (*Id.* ¶¶ 75–79).  These are not, accordingly, "[b]ald allegations that male employees were paid more," *Suzuki v. State Univ. of N.Y. College at Old Westbury*, No. 08-CV-4569, 2013 WL 2898135, at *4 (E.D.N.Y. June 13, 2013), but claims that specific employees outside the protected class were paid quantifiably more despite lacking qualifications she had.  *Cf. Bass v. World Wrestling Fed. Ent., Inc.*, 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001) (dismissing cause of action where the complaint "contain[ed] only two isolated and rudimentary assertions supporting [Plaintiff's] [federal Equal Pay Act ("EPA")] claim," which were, "Upon information and belief, [the p]laintiff was paid lower wages than males performing comparable work," and "[the d]efendant WWFE failed to pay equal wages to plaintiff for equal work, because of her sex, in violation of the [EPA]").

Defendants next argue Plaintiff "failed to specify the alleged 'commissions' that are due and owing to her as 'wages' . . . she merely asserts that her commissions were 'reduced' or 'missing' without providing any facts to support that the 'missing' commissions had actually been earned."  (Defs.' Mem. 20.)  But the Complaint, at this stage, alleged enough to infer Plaintiff was entitled to the 2021 commissions that she was not paid.  (SAC ¶ 129 ("Plaintiff responded . . . stating her objection to the projected commissions, which were *not consistent with her executed ICP*." (emphasis added)); *id.* ¶ 131 ("Plaintiff detailed the specific discrepancies between the projected fourth quarter payouts and the amounts due to her under the executed ICP."); *id.* ¶ 133 ("[T]he deposit amount was incorrect and was less than what she was owed under the original executed ICP[.]").  And she explains why, pointing to retroactive adjustments

29

to her ICP without notice or executed documentation. (*Id.* ¶ 130). This argument accordingly fails, so the Court denies judgment on the pleadings on Plaintiffs' NYLL counts.

Finally, Defendants contend "there are no facts alleged in the SAC that plausibly allege Plaintiff participated in activity protected under the NYLL," because Plaintiff claims she was terminated after filing an EEOC charge, which did not detail any NYLL violations, so Plaintiff's retaliation claims should be dismissed. (Defs.' Mem. 15.) Protected activity includes an employee making "a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner." NYLL § 215(1)(a)(i). Accordingly, to qualify as protected activity, a complaint must include notice that the defendant not only violated the law but violated some "provision of this chapter"—*i.e.*, of the NYLL. *Id.* And Plaintiff clearly alleges she did so. While Defendants focus on her EEOC charge—which, as Plaintiff has alleged, *does* reflect Plaintiff's belief that Defendants' conduct "violate[d] any provision of" the NYLL because it alleges her commissions were underpaid, (*e.g.*, Clark Decl. Ex. 1, at ¶¶ 83–100)[12]—Plaintiff also complained that she was underpaid directly to the committee that sets and adjusts ICPs, of which Xie and deCardenas were members, (SAC ¶¶ 51–56, 112, 117), and to Collier, (*e.g.*, *id.* ¶ 120), and to Guo, (*id.* ¶ 2). *See Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742, 2021 WL 4267815, at *20 (S.D.N.Y. Sept. 20, 2021) ("[The p]laintiff alleges that she complained to [the d]efendants that failing to pay her commissions

---

[12] This exhibit is Plaintiff's EEOC charge. "[P]laintiff's EEOC charge . . . [is a] public record[], of which this Court may take judicial notice," *Muhammad v. New York City Transit Auth.*, 450 F. Supp. 2d 198, 204–05 (E.D.N.Y. 2006), and is incorporated by reference in the Complaint, (*see* SAC ¶ 149).

violated the terms of her employment.  Such complaints are protected activities under NYLL § 215." (citation omitted)).  She has therefore plausibly alleged her complaints put her employer on notice of NYLL-violative acts, and were accordingly protected activities.  And defendants do not argue Plaintiff failed to satisfy any other element of an NYLL prima facie retaliation claim.

Accordingly, Plaintiff's Complaint states a claim for violations of the NYLL and its anti-retaliation provisions.

### III.  Conclusion

Defendants' Motion for Judgment on the Pleadings is denied.  The Court grants Defendants leave to file an amended Answer within 30 days of this Opinion and Order that includes, as an affirmative defense, the release of Plaintiff's claims against certain Defendants in Casa's Chapter 11 bankruptcy.  The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 68).

SO ORDERED.

DATED:      March 30, 2026
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

31